[No. A113376. First Dist., Div. Three. Jan. 10, 2007.]

UPHOLD OUR HERITAGE, Plaintiff and Respondent, v.
TOWN OF WOODSIDE, Defendant and Appellant;
STEVEN JOBS, Real Party in Interest and Appellant.

**COUNSEL**

Aaronson, Dickerson, Cohn & Lanzone and Jean B. Savaree for Defendant and Appellant.

Ellman Burke Hoffman & Johnson and Howard N. Ellman for Real Party in Interest and Appellant.

Chatten-Brown & Carstens, Douglas P. Carstens and Jan Chatten-Brown for Plaintiff and Respondent.

Michael H. Buhler and Elizabeth S. Merritt for National Trust for Historic Preservation as Amicus Curiae on behalf of Plaintiff and Respondent.

Carolyn Ellen Douthat for California Preservation Foundation as Amicus Curiae on behalf of Plaintiff and Respondent.

OPINION

**POLLAK, J.**—Disregarding multiple staff recommendations to the contrary, the Town of Woodside (Town) issued a permit to Steven Jobs authorizing the demolition of a mansion of historic significance to permit the construction of a smaller single-family residence. The Town council (Council), like the planning commission, found that the proposed alternatives to the demolition identified in an environmental impact report (EIR) were not feasible and that overriding considerations justified approval of a conditional demolition permit despite the adverse impact on the environment. Upon a petition by respondent Uphold Our Heritage (Heritage), a private group of preservationists, the superior court concluded that these findings were not supported by substantial evidence and issued a writ of mandate directing the Town to set aside its approval of the demolition permit. The Town and Jobs have jointly appealed. We are not unsympathetic with the manner in which the Town has attempted to strike a balance between the competing interests in permitting the property owner to improve his property as he wishes and preserving as much of the historical resource as possible. Nonetheless, based on our independent review of the administrative record, we must agree with the trial court that the Town's feasibility findings are not supported by substantial evidence. We therefore shall affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY

In 1984, Jobs purchased a single-family home, known as the Jackling House, in Woodside. The two-story house is 17,250 square feet, has 30 rooms, 14 bedrooms and 13.5 bathrooms, and is situated on a site of approximately six acres on a rolling, forested landscape. The mansion was built in 1925 for Daniel Jackling, who was a key figure in the American copper industry. The house was designed by George Washington Smith, a leading architect in the Spanish Colonial Revival style in the United States and contains many unique copper fixtures reflective of Jackling's work in the mining industry.

Jobs lived in the house for approximately 10 years and then rented it to others for several years. Since 2000 the house has been vacant and been permitted to deteriorate. In February 2001, Jobs applied to the Town for a permit to demolish the house. The Town consulted an expert who determined that the building qualifies as an "historical resource" under the California

Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] so that the preparation of an EIR was required before a permit could be issued.[2]

An EIR was prepared by Town staff, including the planning director, Town attorney, and an outside legal consultant hired for her experience in matters relating to historic preservation. The EIR concludes that demolition of the house would result in significant impact to the cultural resources of the state. "The demolition of the house would mean that the physical characteristics of the structure that convey its historical significance (the exterior and interior design) and the presence of the structure as an example of the Spanish Colonial Revival style architecture, and the association of the structure with a historical figure would not be present." The EIR suggests as mitigation measures that prior to demolition, the applicant should develop historical and photographic documentation of the structure and that the applicant should use a qualified salvage company to remove and store features of the home that are identified as significant by an architectural historian. Nonetheless, the EIR concludes that the implementation of these mitigation measures "would retain only a small portion of the house's architectural significance" and for that reason, the measures "would not reduce the impact of demolition to less than significant on the historic resource."

---

[1] All statutory references are to the Public Resources Code unless otherwise indicated.

[2] Under CEQA, a house may be considered an historical resource if it is eligible for registry in the California Registry of Historic Resources, even if it is not actually registered. (§ 21084.1.) "A resource may be listed as an historical resource in the California Register if it meets any of the following National Register of Historic Places criteria: [¶] (1) Is associated with events that have made a significant contribution to the broad patterns of California's history and cultural heritage. [¶] (2) Is associated with the lives of persons important in our past. [¶] (3) Embodies the distinctive characteristics of a type, period, region, or method of construction, or represents the work of an important creative individual, or possesses high artistic values. [¶] (4) Has yielded, or may be likely to yield, information important in prehistory or history." (§ 5024.1, subd. (c).) Based on the expert's opinion, the planning department staff determined that the house qualified for registry under criteria 2 and 3. While Jobs initially challenged this determination by filing an appeal to the planning commission, the appeal was dismissed before a decision was issued. When the matter was raised again before the Council some Council members indicated that while they might have reached a different determination regarding the historical significance of the property, they were bound by the staff's determination that the house qualified for registry because the appeal had been dismissed. On appeal, Jobs and the Town have not challenged the staff's determination in this respect. We express no opinion regarding the correctness of this determination or whether the Council was precluded from considering de novo the historic significance of the property. We proceed, as have the parties, on the premise that demolition of the house is "[a] project that may cause a substantial adverse change in the significance of an historical resource [and therefore] is a project that may have a significant effect on the environment." (§ 21084.1; see § 21060.5.)

The EIR provided five alternatives to the requested demolition permit. These are:

1. No Project Alternative. This alternative "would involve the withdrawal of the project being analyzed, and the resulting impacts would generally be a continuation of the existing conditions on the project site."

2. Historic Rehabilitation of the Jackling House. This alternative "would involve rehabilitation and restoration of the Jackling house to allow for the potential habitation of the home and to maintain the structure's historic significance. . . . Under this alternative, all character-defining features, finishes, and spaces would be retained while allowing for upgrades and changes to the kitchens and bathrooms. The estimated cost to implement Alternative 2 is approximately $4.9 million."

3. Historic Rehabilitation of the Jackling House and New Addition. This alternative "would involve the rehabilitation of the Jackling house with modifications to the existing design to create a more conventional floor plan, especially [to] the second floor. As part of this alternative, an addition to the house would be constructed, composed of three major use areas: a new living area with entertainment room, an office suite, and a fitness area. The estimated cost to implement Alternative 3 is approximately $9.0 million."

4. Onsite Relocation and Historic Rehabilitation of the Jackling House. This alternative "includes relocating the Jackling house to another portion of the project site and rehabilitating the house as described under alternative 2. . . . The estimated cost to implement Alternative 4 is approximately $6.6 million."

5. Offsite Relocation and Historic Rehabilitation of the Jackling House. This alternative "includes relocating the Jackling house to an unknown off-site location and rehabilitating the house as described in Alternative 2. . . . [I]t would cost about $6.0 million to rehabilitate the house and additional site work. The estimated cost to implement Alternative 5 would be at least $0.7 million, but the exact total cost cannot be estimated because there is not a specific target site."

The EIR was forwarded to the Town Planning Commission with the staff's recommendation to deny the demolition permit. The staff concluded that the proposed demolition was inconsistent with the Town's goals of preserving "the rural character and natural beauty of the Town" and encouraging "the maintenance, rehabilitation, and improvements [to] existing buildings and

structures." After a public hearing, however, the planning commission adopted a resolution approving the demolition of the house subject to certain conditions. The planning commission found that the project alternatives were not feasible and that, while demolition of the Jackling House would have significant unavoidable environmental impacts, the Town's interest in conserving its open space resources outweighed the impacts to the historic resource.

Heritage appealed the decision of the planning commission to the Council, raising the same issues that are disputed in this litigation, and the Council considered the application de novo. The Council received a report from its staff recommending denial of the permit on the ground that the alternatives listed in the EIR are feasible and received considerable additional input at a public hearing. Ultimately, the Council adopted a resolution certifying the EIR and authorizing the demolition permit subject to certain conditions.[3] The Council found that "none of the Alternatives identified in the Final EIR are feasible." "Alternative 1 (no project) fails to meet the project objectives and does not protect a historic resource. [¶] Alternative 2 (renovation) is economically unjustifiable. [¶] Alternative 3 (renovation plus addition) is both economically unjustifiable and an enlargement of an already non-conforming structure. [¶] Alternative 4 (moving on site) is economically unjustifiable, results in an enlargement of building mass on the site, and may compromise the historic resource. [¶] Alternative 5 (moving off-site) is economically unjustifiable, physically impossible, and will severely compromise the historic resource." The Council issued a statement of overriding considerations, finding that "as conditioned, the project will provide a public benefit in implementing the Town's General Plan."

Heritage filed a petition for a writ of mandate in the superior court, alleging that "[t]here is no substantial evidence to support the Town's conclusion that the alternatives to the demolition of the Jackling Estate are infeasible" and that "[t]here is no substantial evidence to support the Town's conclusion that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environ-

---

[3] The Council imposed conditions on the permit that require Jobs to merge the subject property with an adjacent property he also owns and record a restrictive covenant to prevent future subdivision of the merged lots. The Council limited future development to 5.5 percent of the merged lots and the size of the house to 6,000 square feet. The Council delayed issuance of the demolition permit for 12 months and required Jobs to work with the Town to market the main house. The house must be donated, and Jobs is to contribute a "reasonable amount, as determined by the Town manager, to the cost of the moving of the main house to a new location." The Council also listed items that must be preserved if the house is not relocated and identified custodians for the care of those items.

ment." The trial court agreed with both contentions and entered judgment granting the petition for writ of mandate. The court ordered the Town to set aside the approval of the demolition permit and the statement of overriding considerations. The Town and Jobs jointly filed a timely notice of appeal.

### Discussion

The petition for a writ of administrative mandamus, as framed by the pleadings, is relatively narrow in scope. Heritage has not challenged the adequacy of the EIR. It contends only that substantial evidence does not support the Town's findings that the alternatives to the proposed demolition identified in the EIR are not feasible and that overriding considerations justify approving the permit notwithstanding the adverse and unmitigated environmental impacts. On appeal, appellants dispute the contrary conclusions reached by the superior court and argue that both findings are supported by substantial evidence. (See also fn. 3, *ante*.)[4]

### 1. *Standard of Review*

"In a mandate proceeding to review an agency's decision for compliance with CEQA, we review the administrative record de novo . . . ." (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 486 [14 Cal.Rptr.3d 308].) We "must determine whether the agency prejudicially abused its discretion. [Citation.] Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination

---

[4] In their reply brief, appellants argue for the first time that alternatives 1 through 4 should not even have been included as alternatives in the EIR because they are incompatible with the project objectives. They argue that Jobs "desired to utilize his lot . . . , merged with the adjoining lot, for construction of a new family home complying with current local ordinances . . . roughly one-third the size of the [Jackling House]." Thus, this new argument goes, any alternative that does not permit the construction of a new home where the Jackling House now sits is not truly an alternative because it does not satisfy the project objectives. Initially, this argument is untimely and has been waived. (See *Sierra Club v. California Coastal Com.* (2005) 35 Cal.4th 839, 864, fn. 20 [28 Cal.Rptr.3d 316, 111 P.3d 294].) In any event, the EIR defined the project objectives as "[c]learance of the primary home and cottage from the site . . . to prepare the site for the eventual construction of a single-family residence." (Original underscoring.) Each of the alternatives identified in the EIR would achieve the desired end result of a habitable single-family home on the property. They are thus properly considered as project alternatives. (See Cal. Code Regs., tit. 14 (hereafter CEQA Guidelines), § 15126.6, subd. (a) ["An EIR shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project"].) Likewise, we reject appellants' argument that Heritage has "forfeited" its challenge to the sufficiency of the evidence by offering a "one-sided recitation of the evidence." (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 749–750 [39 Cal.Rptr.3d 189].) We see nothing to suggest that any portion of the record necessary to evaluate the contentions raised on appeal has been omitted.

is not supported by substantial evidence." (*Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 25–26 [82 Cal.Rptr.2d 398]; see also § 21168; *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 674 [125 Cal.Rptr.2d 745].) "The substantial evidence standard is applied to conclusions, findings and determinations. It also applies to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions. [Citation.] 'Substantial evidence is defined as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." ' [Citations.] . . . 'Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts.' " (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198 [22 Cal.Rptr.3d 203].) "In determining whether substantial evidence supports a finding, the court may not reconsider or reevaluate the evidence presented to the administrative agency. [Citation.] All conflicts in the evidence and any reasonable doubts must be resolved in favor of the agency's findings and decision. [Citation.] [¶] In applying that standard, rather than the less deferential independent judgment test, 'the reviewing court must resolve reasonable doubts in favor of the administrative findings and decision.' " (*Citizens of Goleta Valley v. Board of Supervisors* (1988) 197 Cal.App.3d 1167, 1177 [243 Cal.Rptr. 339].)

## 2. *Relevant CEQA Provisions*

■ It is the policy of this state, under CEQA, to "take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state" including the protection and rehabilitation of "objects of historic or aesthetic significance." (§§ 21001, subd. (a), 21060.5.) Section 21001 "[makes] it clear . . . that CEQA is also concerned with the preservation of historic resources." (*Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 183, fn. 10 [105 Cal.Rptr.2d 214, 19 P.3d 567].) ■ Still further, "The applicability of CEQA to historic structures is made clear by . . . sections 5020.1, subdivision (j), 21084, and 21060.5. Section 5020.1, subdivision (j) states: ' "Historical resource" includes, but is not limited to, any object, building, structure, site, area, place . . . which is historically or archaeologically significant, or is significant in the architectural, engineering, scientific, economic, agricultural, educational, social, political, military, or cultural annals of California.' Section 21084 provides that the California Resources Agency guidelines may specify classes of projects that do not have a significant effect on the environment, but may not include among those projects, inter alia, historic buildings. 'Environment' is defined in section

21060.5 as including 'objects of historic or aesthetic significance.' " (*Friends of Sierra Madre v. City of Sierra Madre, supra,* at p. 186.)

■ Governmental agencies at all levels are required to "consider qualitative factors as well as economic and technical factors and long-term benefits and costs, in addition to short-term benefits and costs and to consider alternatives to proposed actions affecting the environment." (§ 21001, subd. (g).) Further, the Legislature has also declared it to be the policy of the state "that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects . . . ." (§ 21002.) ■ "Our Supreme Court has described the alternatives and mitigation sections as 'the core' of an EIR." (*Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1029 [68 Cal.Rptr.2d 367].) In furtherance of this policy, section 21081, subdivision (a), "contains a 'substantive mandate' requiring public agencies to refrain from approving projects with significant environmental effects if 'there are feasible alternatives or mitigation measures' that can substantially lessen or avoid those effects." (*County of San Diego v. Grossmont-Cuyamaca Community College Dist.* (2006) 141 Cal.App.4th 86, 98 [45 Cal.Rptr.3d 674], italics omitted; see *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 134 [65 Cal.Rptr.2d 580, 939 P.2d 1280].) Subdivision (b) of section 21081, which "codifies an 'override' requirement and comes into play where the lead agency has issued an infeasibility finding under section 21081(a)(3)" (*County of San Diego v. Grossmont-Cuyamaca Community College Dist., supra,* 141 Cal.App.4th at p. 100), allows the lead agency to approve the project if it "finds that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment" (§ 21081).[5] Under CEQA "feasible" is defined as "capable of being accomplished in a

---

[5] Section 21081 provides in full, "Pursuant to the policy stated in Sections 21002 and 21002.1, no public agency shall approve or carry out a project for which an environmental impact report has been certified which identifies one or more significant effects on the environment that would occur if the project is approved or carried out unless both of the following occur: [¶] (a) The public agency makes one or more of the following findings with respect to each significant effect: [¶] (1) Changes or alterations have been required in, or incorporated into, the project which mitigate or avoid the significant effects on the environment. [¶] (2) Those changes or alterations are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency. [¶] (3) Specific economic, legal, social, technological, or other considerations, including considerations for the provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or alternatives identified in the environmental impact report. [¶] (b) With respect to significant effects which were subject to a finding under paragraph (3) of subdivision (a), the public agency finds that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment."

successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1; see CEQA Guidelines, § 15364.)

3. *Economic Feasibility*

The Council found that alternatives 2 through 5 were not economically feasible. Appellants contend that these findings are supported by evidence that the cost of restoration was estimated to range from $4.9 million, based on the analysis in the EIR, to between $5 million and $10 million, as estimated by Jobs. They also cite statements at the hearing made by Councilmember Tanner, a contractor, who inspected the property and determined that the cost to restore the house would be "incredible." He explained that the house was suffering from substantial dry rot. "Anything that was exterior that was on wood dry rotted. And it would go back inside the main part of the structure. And you really had to take them apart all the time and fix them. The standards back then for building weren't, they were for high maintenance. So, whoever had this, buys this house if they wanted to restore it or whatever happens to it, it would be a very high maintenance home and not seismically correct."

The trial court concluded that this evidence was insufficient. The court explained, "There is *no* evidence of any economic analysis whatsoever to compare the cost of the proposed alternatives (which costs *are* estimated in the EIR, except for alternative #5) versus the cost of the proposed project, i.e., the estimated cost of the new residence. The 'purpose' of the project is to tear down a single family residence in order to build a single family residence. No costs of building the new residence were provided to the Town Council because Jobs has declined to provide any design, plans, or specification of the new residence until after his demolition permit is granted. Thus, there is no cost comparison or analysis supporting any of these findings that each of the alternatives are 'economically unjustifiable.' [¶] . . . [¶] That the alternatives may cost millions of dollars is not enough information as it has no context. It is certainly possible that Jobs may ultimately seek to build a house which costs more than simply rehabilitating the existing house—a house he previously lived in for 10 years. All of this is unknown to the Town Council, and thus their finding of economic infeasibility is not supported by substantial evidence, and was arbitrary and capricious." (Boldface omitted.)

■ We agree with the trial court that the Council's finding that the alternatives are not economically feasible is not supported by substantial

evidence, at least with regard to alternatives 2 and 3.[6] As noted by the trial court, the feasibility of the alternatives must be evaluated within the context of the proposed project. "The fact that an alternative may be more expensive or less profitable is not sufficient to show that the alternative is financially infeasible. What is required is evidence that the *additional* costs or lost profitability are sufficiently severe as to render it impractical to proceed with the project." (*Citizens of Goleta Valley v. Board of Supervisors, supra*, 197 Cal.App.3d at p. 1181, italics added.) While an EIR need not analyze " ' " 'every imaginable alternative or mitigation measure,' " ' " "it should evince good faith and a reasoned analysis." (*Los Angeles Unified School Dist. v. City of Los Angeles, supra*, 58 Cal.App.4th at p. 1029, italics omitted; see *San Francisco Ecology Center v. City and County of San Francisco* (1975) 48 Cal.App.3d 584, 596 [122 Cal.Rptr. 100]; CEQA Guidelines, § 15088, subd. (c).)

■ The fact that rehabilitation may cost between $4.9 million and $10 million is insufficient to support a reasonable inference that this alternative is not economically feasible. Without some information concerning the cost of constructing a new residence on the property, it is not possible to determine whether the cost of renovating the existing historic structure is reasonable or feasible. Indeed, so far as the present record reflects, it may be less expensive to renovate and preserve the existing structure than to build a new 6,000-square-foot residence suitable for the area. If the cost of renovation exceeds the cost of new construction, it is the magnitude of the difference that will determine the feasibility of this alternative. (See *Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336 [46 Cal.Rptr.3d 902] [city's finding that reduced-size alternative was infeasible because it would produce a competitive disadvantage was not supported by substantial evidence where neither the EIR nor the administrative record contained any data about the size of other home improvement warehouses in the area with which the applicant would compete].) There is no evidence in the record on which such a determination can be made.

■ In requiring such an evaluation, we do not imply any disagreement with appellants that Jobs's personal wealth or ability to shoulder the costs of the proposed alternatives is irrelevant. In *Maintain Our Desert Environment v. Town of Apple Valley* (2004) 124 Cal.App.4th 430 [15 Cal.Rptr.3d 322], the court rejected the claim that the financial wherewithal of the project applicant bears upon the feasibility of mitigation measures and project alternatives. (*Id.* at p. 448.) CEQA should not be interpreted to allow

---

[6] With regard to alternatives 4 and 5, the fact that the $5 million cost of the mitigation measure (relocating and renovation) would be in addition to the cost of building a new home before the project goals are achieved supports a reasonable inference that these alternatives are not economically feasible.

discrimination between project applicants for an identical project based upon the financial status of the applicant. (*Maintain Our Desert Environment*, at pp. 448–449.) The court explained, "Economic unfeasibility is not measured by increased cost or lost profit, but upon whether the effect of the proposed mitigation is such that the project is rendered impractical. [Citation.] The fact that a project costs too much to be profitable or cannot operate at a profit so as to render it impractical does not hinge on the wealth of its proponent. No proponent, whether wealthy or not, is likely to proceed with a project that will not be economically successful. But, if the project can be economically successful with mitigation, then CEQA requires that mitigation, regardless of the proponent's financial status." (*Maintain Our Desert Environment*, at p. 449.) Accordingly, the question is not whether Jobs can afford the proposed alternative, but whether the marginal costs of the alternative as compared to the cost of the proposed project are so great that a reasonably prudent property owner would not proceed with the rehabilitation. (See *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco, supra*, 102 Cal.App.4th at pp. 693–694 [applying prudent person standard to determine economic feasibility of proposed alternatives].)

Appellants contend that because the project involves a single-family residence intended to be used as a family home, rather than a commercial enterprise, extensive cost information is not required to support the finding of economic infeasibility. They argue that "[d]eterminations under CEQA are controlled by a rule of reason, and what is reasonably practical under relevant circumstances." While the feasibility of constructing a single-family home for personal use involves a certain degree of subjectivity, some context is nonetheless necessary. It may be sufficient to show that the cost of rehabilitating the existing house would be significantly more than the cost of building a new home of a quality appropriate to the area, or that the cost of the proposed alternative is so great that the property owner could never expect to recover the investment on resale. For example, in *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco, supra*, 102 Cal.App.4th at pages 679–680, the court noted that the experts who analyzed the alternative plans "independently concluded that, even after taking into account all possible monetary incentives for historic preservation, the substantial costs of rehabilitating and preserving the Emporium Building would be millions of dollars more than the value the Building could thereafter generate in its existing configuration, through any plausible revenue-producing usage, whether retail, office or residential. Under these circumstances, the Building has no remaining market value." (See also *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 715 [29 Cal.Rptr.2d 182] [evidence of economic infeasibility included "project sponsor's comments that—based on its market surveys—it had rejected the concept of a lower-density project 'because the houses would be necessarily more expensive than

those of the proposed project,' and would defeat the project objective of providing . . . 'the least expensive single-family housing for the vicinity' "].)

It is not necessary to identify every conceivable means of establishing the lack of feasibility in a residential context, as the record in this case does not contain any such evidence. Jobs has not submitted any estimates or other evidence indicating the likely cost of his proposed replacement home and there is no evidence of the average cost of building a 6,000-square-foot home in Woodside. (See, e.g., *Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1041 [48 Cal.Rptr.3d 544] [economic feasibility of mitigation measures is tied to the relevant conditions in the local real estate market].) Likewise, no analysis of the local real estate market has been performed. The record simply does not support the Council's finding that alternatives 2 and 3 are not economically feasible.

### 4. *Legal Feasibility*

Appellants contend that even if the alternatives are economically feasible, substantial evidence supports a finding that the alternatives are not legally feasible. Appellants recognize that the Council did not expressly find that the proposed alternatives are not legally feasible, but suggest that the Council's concern that it lacked the power to compel Jobs to restore the existing structure implies a finding of legal infeasibility. We need not decide whether such a finding can be implied, because any such finding would not be defensible.

Appellants contend that because the Town cannot compel Jobs to restore Jackling House or to sell his property, the alternatives "are not feasible because they are not 'capable of being accomplished in a successful manner.' " The willingness of the applicant to accept a feasible alternative, however, is no more relevant than the financial ability of the applicant to complete the alternative. To define feasible as appellants suggest would render CEQA meaningless.

Contrary to appellants' argument, *Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383 [133 Cal.Rptr.2d 718] and *Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco* (1980) 106 Cal.App.3d 893 [165 Cal.Rptr. 401] do not support their interpretation of legal infeasibility. Both are cases of economic infeasibility. In the first case, the court held substantial evidence supported the county's finding that a reduction in the size of a proposed dairy project was economically infeasible. The dairy owner testified at the hearing that he did not believe the reduced-size alternative would be feasible and the court found that his testimony, "the lender's letter and the economic analysis constitute

substantial evidence supporting the board's finding that the reduced-herd-size alternative is not economically feasible; elimination of all profit and loss of construction financing adequately proves that the reduced-herd-size alternative is not viable." (*Association of Irritated Residents v. County of Madera, supra*, at p. 1401.) In the second case, the court rejected the association's claim that the county failed to consider as an alternative that the building could be sold to a different developer. Although the court noted that the current owner did not want to sell the building, it concluded that the alternative was not economically feasible because the project would not be profitable for any developer. (*Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco, supra*, at p. 912.) In neither of these cases was the applicant's refusal to proceed with an alternative project the basis of the infeasibility finding.[7]

Appellants' reliance on *Sequoyah Hills Homeowners Assn. v. City of Oakland, supra*, 23 Cal.App.4th 704, is similarly misplaced. In that case, the court explained that an alternative is not feasible where there is no way to legally implement it. (*Id.* at pp. 714–715.) Applying that rule, the court held that substantial evidence supported the city's determination that a project alternative, a decrease in a housing development's density, was legally infeasible because of a Government Code provision prohibiting the conditioning of approval on a reduction in density under the particular circumstances. (Compare *id.* at pp. 715–716, citing Gov. Code, § 65589.5, subd. (j)(1), with *City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 356–357 [46 Cal.Rptr.3d 355, 138 P.3d 692] [alternative requiring state university to make voluntary contributions to the costs of infrastructure improvements in mitigation of off-campus environmental effects of planned campus expansion was not rendered legally infeasible by state constitutional prohibitions against taxation of state-owned property and gifting of public funds].)

In the present situation, there is no legal restraint on the Town's ability to approve the rehabilitation of Jackling House, or to deny permission to demolish the structure. The fact that Jobs does not wish to proceed with the rehabilitation does not make that alternative legally infeasible. It is true that if there is a feasible alternative which Jobs as the owner of the property does not wish to pursue, and he chooses not to sell the property to somebody who does, the historic house may continue to sit idle and potentially deteriorate over time. This undoubtedly presents the Town and Jobs with a

---

[7] The same is true of *Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1507–1508 [19 Cal.Rptr.3d 1], in which the court held that substantial evidence supported the board's finding that a reduced development alternative was economically infeasible based on evidence that the alternative would not achieve the objective of consolidating the applicant's operations to minimize costs.

dilemma, but there is no occasion here to consider options that may be available to these parties should it ultimately be determined that there is a feasible alternative to demolition. However, unless and until it is properly established that the alternatives to demolition are not feasible—i.e., "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors" (§ 21061.1; see CEQA Guidelines, § 15364)—the Town is prohibited from authorizing the demolition. "CEQA does not authorize an agency to proceed with a project that will have significant, unmitigated effects on the environment, based simply on a weighing of those effects against the project's benefits, unless the measures necessary to mitigate those effects are truly infeasible. Such a rule, even were it not wholly inconsistent with the relevant statute [citation], would tend to displace the fundamental obligation of '[e]ach public agency [to] mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so.' " (*City of Marina v. Board of Trustees of California State University*, *supra*, 39 Cal.4th at pp. 368–369.)

## 5. Statement of Overriding Considerations

"When a public agency has found that a project's significant environmental effects cannot feasibly be mitigated, the agency may nevertheless proceed with the project if it also finds 'that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment.' " (*City of Marina v. Board of Trustees of California State University, supra*, 39 Cal.4th at p. 368.) "[A]n agency's decision that the specific benefits a project offers outweigh any environmental effects that cannot feasibly be mitigated, while subject to review for abuse of discretion [citation], lies at the core of the lead agency's discretionary responsibility under CEQA and is, for that reason, not lightly to be overturned." (*Ibid.*) While "much deference" must be accorded the agency's resolution of the competing interests (*ibid.*), here the "statement of overriding considerations is invalid for a reason that does not require us to reweigh benefits and detriments, or to inquire into the statement's factual basis. A statement of overriding considerations is required, and offers a proper basis for approving a project despite the existence of unmitigated environmental effects, only when the measures necessary to mitigate or avoid those effects have properly been found to be infeasible." (*Ibid.*; see also *County of San Diego v. Grossmont-Cuyamaca Community College Dist., supra*, 141 Cal.App.4th at p. 108, fn. 18.) Since the record does not support the Council's finding that all of the alternatives included in the EIR are infeasible, the Council's statement of overriding circumstances is necessarily invalid.

## Disposition

The judgment is affirmed. Heritage shall recover its costs on appeal.

Parrilli, Acting P. J., and Siggins, J., concurred.

A petition for a rehearing was denied February 7, 2007, and the petition of both appellant and real party in interest for review by the Supreme Court was denied April 25, 2007, S150778. Baxter, J., was of the opinion that the petition should be granted.