[No. D057524. Fourth Dist., Div. One. May 19, 2011.]

CITIZENS FOR RESPONSIBLE EQUITABLE ENVIRONMENTAL DEVELOPMENT, Plaintiff and Appellant, v.
CITY OF SAN DIEGO, Defendant and Respondent;
PARDEE HOMES, Real Party in Interest and Respondent.

516

518

COUNSEL

Briggs Law Corporation, Cory J. Briggs and Mekaela M. Gladden for Plaintff and Appellant.

Jan I. Goldsmith, City Attorney, Donald R. Worley, Assistant City Attorney, and Heather L. Stroud, Deputy City Attorney, for Defendant and Respondent.

Sheppard, Mullin, Richter & Hampton, John E. Ponder, Jeffrey W. Forrest and Karin Dougan Vogel for Real Party in Interest and Respondent.

OPINION

McCONNELL, P. J.—This is an action under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). Citizens for Responsible Equitable Environmental Development (CREED) challenges the City of San Diego's (the City) certification of an addendum to a 1994 final environmental impact report (FEIR) for a residential development by Pardee Homes (Pardee).[1] CREED contends reversal is required because the City did not follow the statutory procedure in adopting a water supply assessment (WSA) required by the Water Code and CEQA, and new information on drought and the effect of greenhouse gas emissions on climate require a supplemental environmental impact report (SEIR). We affirm the judgment. CREED failed to exhaust administrative remedies, and even if that were not the case, we would find against it on the merits.

FACTUAL AND PROCEDURAL BACKGROUND[2]

In 1994 the City certified the FEIR for a precise plan, a 664.8-acre mixed-use development within the Otay Mesa Community Plan area. The precise plan anticipated the construction of more than 4,000 dwelling units allocated among several planning areas. In 2008 Pardee applied to the City for the approval of a planned development, Playa del Sol, in one of the last planning areas to be developed. It is to include 16 three- and four-story buildings with 1,578 condominium units and three recreational buildings.

In April 2008 the City's water department prepared a WSA required by the Water Code and CEQA. The WSA concludes water supplies will be sufficient to meet the needs of Playa del Sol during a projected 20-year period.

---

[1] When discussing the contentions of the City and Pardee, who have submitted a joint respondents' brief, we refer to them together as the City.

[2] We draw the facts from the record before the City when it took the alleged action. (See *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 421 [53 Cal.Rptr.3d 821, 150 P.3d 709] (*Vineyard*).)

The City's development services department prepared an addendum to the 1994 FEIR, which discusses and incorporates the WSA. The development services department concluded an SEIR is unwarranted because there were "no new significant environmental impacts not considered in the previous [F]EIR," "[n]o substantial changes have occurred with respect to the circumstances under which the project is undertaken," and "[t]here is no new information of substantial importance to the project."

On October 15, 2008, the City issued a public notice on the addendum to the FEIR. The City made the FEIR and supporting documents, including the WSA, available for public review. At a noticed public hearing on November 13, 2008, the city planning commission recommended that the City approve the project.

The city council held a noticed public hearing on January 20, 2009. That day, CREED submitted a cursory letter to the city clerk urging the city council not to approve the project on various grounds. CREED complained that while a WSA was prepared for the project, "it was not subject to public review." CREED also challenged the project on the ground it "will cause direct and indirect greenhouse-gas emissions that, when considered cumulatively, are significant."

CREED also submitted a digital video disk (DVD) that contained more than 4,000 pages of documents and data. The appellate record contains hard copies of the documents on the DVD. It appears that the DVD contained no table of contents, no particular organization, no summary of information, and no explanation of how the copious materials may pertain to the proposed Playa del Sol project.

CREED did not appear at the January 20 hearing to offer any elaboration. For other reasons, the city council continued the hearing to February 17, 2009.

CREED also did not appear at the continued hearing on February 17 to offer any elaboration. That day CREED again submitted a cursory letter to the city clerk that briefly outlined objections to the project.[3] The city council certified the addendum to the FEIR and approved the project.

On June 4, 2009, CREED filed a first amended petition for writ of mandate and complaint (hereafter petition) against the City. The petition alleged the City violated CEQA by relying on an addendum to the 1994 FEIR rather than

---

[3] CREED also submitted another DVD, but it is not included in the administrative record. The court reportedly denied CREED's motion to augment the administrative record to include the DVD. CREED does not challenge the ruling.

issuing an SEIR.[4] In its trial brief, CREED argued an SEIR is required because there are changed circumstances and new information pertaining to water supply and the effect of greenhouse gas emissions on climate. CREED also argued the City did not adopt the WSA in accordance with the procedure outlined in the Water Code.

On March 23, 2010, the court issued a tentative ruling denying CREED's petition. The court determined the City's certification of the addendum to the 1994 FEIR, which incorporated the WSA, was equivalent to approval of the WSA. As to drought and climate change, the court determined CREED failed to exhaust administrative remedies, and alternatively, CREED did not meet its burden of showing changed circumstances, new information, or deleterious environmental effects justifying an SEIR.

## DISCUSSION

### I

#### *Standard of Review*

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' [Citation.] Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*Vineyard, supra,* 40 Cal.4th at p. 426, fn. omitted.)

" ' "Substantial evidence is defined as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' " ' " (*Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 596 [54 Cal.Rptr.3d 366].) " 'In determining whether substantial evidence supports a finding, the court may not reconsider or reevaluate the evidence presented to the administrative agency. [Citation.] All conflicts in the evidence and any reasonable doubts must be resolved in favor

---

[4] CREED has abandoned the petition's allegations that the City violated CEQA notice requirements, the Subdivision Map Act (Gov. Code, § 66410 et seq.), the City's Municipal Code, and CREED's due process rights.

of the agency's findings and decision. [Citation.] [¶] In applying that standard, rather than the less deferential independent judgment test, "the reviewing court must resolve reasonable doubts in favor of the administrative findings and decision." ' " (*Ibid.*; see Cal. Code Regs., tit. 14, § 15384 (hereafter Guidelines).)[5]

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard, supra,* 40 Cal.4th at p. 427.)

II

*WSA Procedure*

Preliminarily, we dispose of CREED's contention we must reverse the judgment because the City did not approve the WSA in accordance with the procedure set forth in Water Code section 10910, subdivision (g)(1).

■ The Legislature enacted the WSA law in 1995 and amended it in 2001. (Wat. Code, §§ 10910–10915; *California Water Impact Network v. Newhall County Water Dist.* (2008) 161 Cal.App.4th 1464, 1478, 1480–1481 [75 Cal.Rptr.3d 393] (*Newhall*).) When a proposed development is subject to CEQA, and it is also a "project" within the meaning of Water Code section 10912, a WSA is required. (Wat. Code, § 10910, subd. (b).) Playa del Sol exceeds 500 dwelling units, which falls within the definition of Water Code section 10912. (*Id.,* § 10912, subd. (a)(1).)

The WSA is intended to assist local governments in deciding whether to approve a project. (*O.W.L. Foundation v. City of Rohnert Park* (2008) 168 Cal.App.4th 568, 576 [86 Cal.Rptr.3d 1].) It must include specified information, including "a discussion with regard to whether the total projected water supplies, determined to be available . . . for the project during normal, single dry, and multiple dry water years during a 20-year projection, will meet the projected water demand associated with the proposed project, in addition to existing and planned future uses . . . ." (Wat. Code, § 10910, subd. (c)(4).) The WSA must be included in any CEQA document prepared for the project. (Wat. Code, § 10911, subd. (b).) Further, a provision of CEQA requires compliance with the WSA law. (Pub. Resources Code, § 21151.9.)

---

[5] CEQA Guidelines, promulgated by the state's Resources Agency under Public Resources Code section 21083, appear at California Code of Regulations, title 14, section 15000 et seq. "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard, supra,* 40 Cal.4th at p. 428, fn. 5.)

Water Code section 10910, subdivision (g)(1) provides in relevant part: "[T]he governing body of each public water system shall submit the assessment to the city or county not later than 90 days from the date on which the request was received. The governing body of each public water system . . . shall approve the assessment prepared pursuant to this section at a regular or special meeting." A 30-day extension of the 90-day period is available. (Wat. Code, § 10910, subd. (g)(2).)

CREED's theory is that the city council's resolution certifying the addendum to the 1994 EIR (environmental impact report) is insufficient because it does not separately state the WSA was approved. The addendum discussed and incorporated the WSA, and the city council certified the addendum at a regular meeting on February 17, 2009. Under these circumstances, we agree with the trial court's finding the City's certification of the addendum was equivalent to approval of the WSA. It would be absurd to reverse the judgment on the ground CREED urges.

In a related argument, CREED asserts reversal is required because the City's timing was faulty. In CREED's view, the WSA should be "approved early in the process, likely long before the CEQA document is up for certification and the project is up for approval." CREED cites Water Code section 10910, subdivision (g)(1), but it contains no requirement for early approval of a WSA when, as here, the water supplier and lead agency are the same entity (the City) and are governed by the same entity (the city council). As applied here, section 10910, subdivision (g)(1) required the water department to submit the WSA to the City within 90 days of a request, and the city council to approve the WSA at a regular or special meeting. The statute did not require the city council to approve the WSA before it was submitted to the City for inclusion in the 1994 FEIR. As the City points out, requiring the same legislative body to hold two different hearings on the matter, or approve a WSA and CEQA document in different motions, "would not enhance public review or local agency decision-making, and instead would merely create additional paperwork." The "purpose of CEQA is to inform government decision makers and their constituency of the consequences of a given project, not to derail it in a sea of administrative hearings and paperwork." (*Long Beach Sav. & Loan Assn. v. Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249, 263 [232 Cal.Rptr. 772].)

■ CREED's reliance on *Newhall, supra,* 161 Cal.App.4th 1464, is misplaced. *Newhall* explains generally that Water Code section 10910, subdivision (g)(1) "specifies the timeframe for preparing and submitting a WSA. Specifically, the 'governing body' of each public water system is required to 'approve' the WSA at a regular or special meeting and must submit the WSA to the lead agency not later than 90 days from the date on

which the request was received." (*Newhall*, at p. 1481.) In *Newhall*, the water supplier was an independent water district, and in that circumstance its governing body would naturally approve the WSA before submitting it to the lead agency. *Newhall* does not pertain to the situation in which the water supplier and the lead agency are the same entity.

██ In *Newhall*, there was no issue as to the propriety of the approval of the WSA. The court held an environmental group could not challenge the water district's approval of a WSA because "the WSA is a technical informational document and not a 'final' act or determination subject to mandamus review," and "until the [c]ity certified the EIR and approved the project, the adequacy of the WSA was not subject to judicial challenge." (*Newhall, supra*, 161 Cal.App.4th at p. 1471.) ██ Although the governing board of a water district approves the WSA, it is the city or county that ultimately determines whether water supplies will be sufficient for the project. (Wat. Code, § 10911, subd. (c).) "While the lead agency must include the WSA in the EIR, the lead agency is not required to accept the WSA's conclusions." (*Newhall*, at p. 1487.) *Newhall* has no application here. ██ " 'It is axiomatic that cases are not authority for propositions not considered.' " (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388 [53 Cal.Rptr.2d 81, 916 P.2d 476].)

██ CREED's reliance on *Vineyard, supra*, 40 Cal.4th 412, is also misplaced. *Vineyard* explains that Water Code section 10910 "require[s] the city or county considering a project to obtain, at the outset of the CEQA process, a [WSA] from the applicable public water system. [Citation.] The [WSA] is then to be included in any CEQA document the city or county prepares for the project." (*Vineyard, supra*, at p. 433.) *Vineyard* does not hold that a WSA must be approved before submittal to the lead agency when the water supplier and the lead agency are the same entity. Here, Pardee applied for approval of Playa del Sol some time in 2008, and in April 2008 the city water department submitted the WSA. It appears that the water department submitted the WSA to the City at the outset of the CEQA process.

██ We disagree with CREED's theory that the City's procedure in adopting the WSA deprived the public of the opportunity "to weigh in on the impacts of a major water-consuming development." While notices for the CEQA hearings did not reference the WSA, CREED cites no authority showing such a requirement. The "WSA's role in the EIR process is akin to that of other informational opinions provided by other entities concerning potential environmental impacts—such as traffic, population density or air quality. The fact that the duties of the water provider in preparing the WSA . . . are committed to statute does not change the fundamental nature of

the WSA itself as an advisory and informational document." (*Newhall, supra,* 161 Cal.App.4th at p. 1486.)[6]

In October 2008 the City's development services department issued a public notice of the proposed draft addendum to the FEIR, inviting comments regarding its adequacy. The notice also advises the public on how to request a copy of the proposed addendum and supporting documents, and the names of persons to contact for more information. The January 30, 2009 notice of the February 17 hearing of the city council also alerted the public that the planning commission recommended the approval of the addendum, and advised how to contact the City. Further, the city council and staff discussed the WSA at the February 17 hearing. The matter was open and transparent, and there is no suggestion a different procedure would have further assisted the public.

III

*Drought*

CREED contends reversal is required because an SEIR was required rather than an addendum to the 1994 FEIR. After an agency has approved an EIR (or FEIR), it may not require an SEIR unless "[s]ubstantial changes are proposed in the project which will require major revisions of the [EIR]"; "[s]ubstantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report"; or "[n]ew information, which was not known and could not have been known at the time the [EIR] was certified as complete, becomes available." (Pub. Resources Code, § 21166.) The new information must show the "project will have one or more significant effects not discussed in the previous EIR" (Guidelines, § 15162(a)(3)(A)), or "[s]ignificant effects previously examined will be substantially more severe than shown in the previous EIR" (Guidelines, § 15162(a)(3)(B)).

It is CREED's burden to demonstrate that the City's decision to approve Playa del Sol with an addendum to the 1994 FEIR, "rather than to require an

---

[6] A CEQA Guideline provides: "The information contained in an EIR shall include summarized technical data, maps, plot plans, diagrams, and similar relevant information sufficient to permit full assessment of significant environmental impacts by reviewing agencies and members of the public. Placement of highly technical and specialized analysis and data in the body of an EIR should be avoided through inclusion of supporting information and analyses as appendices to the main body of the EIR. Appendices to the EIR may be prepared in volumes separate from the basic EIR document, but shall be readily available for public examination and shall be submitted to all clearinghouses which assist in public review." (Guidelines, § 15147.)

SEIR, is not supported by substantial evidence and was thus improper." (*Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1397 [64 Cal.Rptr.3d 79], citing Pub. Resources Code, § 21168; see Guidelines, § 15384(a).) CREED asserts the City's reliance on an addendum rather lacks evidentiary support, because CREED submitted "substantial evidence" that "[w]e are now in a drought."

■ The City contends, and the trial court found, that CREED failed to exhaust administrative remedies on the drought issue. A CEQA challenge is not preserved "unless the alleged grounds for noncompliance with [CEQA] were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing . . . ." (Pub. Resources Code, § 21177, subd. (a).) "Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action." (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1199 [22 Cal.Rptr.3d 203].)

"To advance the exhaustion doctrine's purpose '[t]he "exact issue" must have been presented to the administrative agency . . . .' [Citation.] While ' "less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding" because, . . . parties in such proceedings generally are not represented by counsel . . ." [citation]' [citation], 'generalized environmental comments at public hearings,' 'relatively . . . bland and general references to environmental matters' [citation], or 'isolated and unelaborated comment[s]' [citation] will not suffice. The same is true for ' "[g]eneral objections to project approval . . . ." [Citations.]' [Citation.] ' "[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them." ' " (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 535–536 [78 Cal.Rptr.3d 1].)

" 'The petitioner bears the burden of demonstrating that the issues raised in the judicial proceeding were first raised at the administrative level. [Citation.]' [Citation.] An appellate court employs a de novo standard of review when determining whether the exhaustion of administrative remedies doctrine applies." (*Sierra Club v. City of Orange, supra*, 163 Cal.App.4th at p. 536.)

■ We conclude CREED has not met its burden. The letters CREED submitted to the city clerk on the dates of the CEQA hearings contain only general, unelaborated objections insufficient to satisfy the exhaustion doctrine. The letters do not even contain the term "drought," and as to the WSA,

CREED merely claimed the City did not follow the proper *procedure* in adopting it. The letters raised no substantive issue with the WSA.[7]

▪ Additionally, CREED cannot claim exhaustion by citing documents buried among thousands of documents on the DVD it submitted to the city clerk before the first CEQA hearing. The cite to CREED's letter accompanying the DVD was, "*See also* water supply folder (evidence regarding decreasing water supply)," which does not indicate the DVD contained information on *drought*. To satisfy the exhaustion doctrine, an issue must be "fairly presented" to the agency. (*Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 282 [42 Cal.Rptr.3d 537].) Evidence must be presented in a manner that gives the agency the opportunity to respond with countervailing evidence. (*Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1196–1197 [200 Cal.Rptr. 855].) The City cannot be expected to pore through thousands of documents to find something that arguably supports CREED's belief the project should not go forward. Additionally, CREED did not appear at either CEQA hearing to elaborate on its position. It appears from CREED's haphazard approach that its sole intent was to preserve an appeal. " ' "It was never contemplated that a party to an administrative hearing should . . . make only a perfunctory or 'skeleton' showing in the hearing and thereafter obtain an unlimited trial de novo, on expanded issues, in the reviewing court." ' " (*Coalition for Student Action v. City of Fullerton, supra*, at p. 1197.)

▪ Further, we are unpersuaded by CREED's argument the exhaustion doctrine is satisfied because at the February 17, 2009 CEQA hearing former Councilmember Frye objected to the project on the ground that the addendum to the 1994 FEIR did not expressly address drought and the prospect of water rationing for the City's existing water department customers. It is true that a "petitioner may allege as a ground of noncompliance any objection that was presented by any person or entity during the administrative proceedings." (*Bakersfield Citizens for Local Control v. City of Bakersfield, supra*, 124 Cal.App.4th at p. 1199.) The gravamen of CREED's petition, however, was that the City violated CEQA by not proceeding by way of an SEIR rather than an addendum to the FEIR. Former Councilmember Frye never argued an SEIR was necessary, and thus the issue she raised and the issue on appeal are not exactly the same. Before CREED instituted its litigation, the City was not given the opportunity to consider whether an SEIR was required. ▪ "The essence of the exhaustion doctrine is the public agency's opportunity to receive and respond to articulated factual issues and legal theories *before* its actions are subjected to judicial review." (*Coalition for Student Action v. City of Fullerton, supra*, 153 Cal.App.3d at p. 1198.)

---

[7] A law firm represented CREED at the administrative level, and it submitted letters on CREED's behalf to the city clerk before the two CEQA hearings.

█ In any event, even if former Councilmember Frye's comments were sufficient to satisfy the exhaustion doctrine, we would find against CREED. CREED violates a fundamental principle of appellate practice by not setting forth the evidence supporting the City's approval of the project. "[A]n attack on the evidence without a fair statement of the evidence is entitled to no consideration when it is apparent that a substantial amount of evidence was received on behalf of the respondent." (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 [19 Cal.Rptr.3d 416].) The appellant "must set forth in its brief all the material evidence on the point, not merely its own evidence. [Citation.] A failure to do so is deemed a concession that the evidence supports the findings. [Citation.] . . . This failure to present all relevant evidence on the point 'is fatal.' [Citation.] 'A reviewing court will not independently review the record to make up for appellant's failure to carry [its] burden.' " (*Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 112–113 [56 Cal.Rptr.3d 728].)

█ It is apparent that the city council received a substantial amount of evidence before it approved Playa del Sol. The WSA addresses water supply for a projected 20-year period, including normal and dry year forecasts, but CREED's opening brief ignores the information.[8] The section of CREED's reply brief devoted to refuting the City's claim CREED did not fairly portray the evidence does not even mention the WSA. Another portion of the reply brief gives the WSA only passing reference. Additionally, in both of its briefs, CREED ignores that staff advised the city council that wholesale water suppliers can provide the water required for Playa del Sol over the long term, and the project is subject to the City's water use ordinance, meaning Pardee's ability to obtain necessary development permits is subject to water supply. The City's legal counsel confirmed that information. "An agency may rely on the expertise of its planning staff in determining whether a project will not

---

[8] The WSA states: "Based on a normal water supply year, the estimated water supply projected in five-year increments for a 20-year projection will meet the estimated water demand of 227,456 acre-feet (AF) in 2005 and 275,925 AF in 2030 . . . . Based on dry year forecasts, the estimated water supply will also meet the projected water demand during single and multiple-dry year scenarios. For a single-dry year a projected supply of 295,240 AF (in 2030) within the Water Department service area is available, ·and for *multiple-dry years* (2026–2030) a projected supply of 287,119 AF, 289,149 AF, 291,179 AF, 293,210 AF, and 295,240 AF respectively is available." (Fn. omitted, italics added.) The WSA includes tables showing projected water supplies and demand for dry years. The WSA verifies "sufficient water supply would be available to serve existing demand, project demand, and projected future water demands within the Water Department's service area, under normal and dry year forecasts." Relying on the WSA, the addendum to the 1994 FEIR explains the "Playa [d]el Sol project water demands would account for approximately one-quarter of one percent of the City's total projected potable water supply under normal water year conditions. Project demands would impact single and multiple dry water year citywide projections to an even lesser degree." The addendum concludes that "impacts to water supply from the proposed Playa [d]el Sol project would be less than significant."

have a significant impact on the environment." (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 907 [69 Cal.Rptr.3d 105]; *Greenebaum v. City of Los Angeles* (1984) 153 Cal.App.3d 391, 413 [200 Cal.Rptr. 237] ["city planning department officers do qualify as experts since this type of analysis is their business"].)

Further, even without forfeiture, CREED would not prevail. Former Councilmember Frye's comments are not evidence to support the requirement of an SEIR. In arguing it presented substantial evidence of drought as new information, CREED cites only to information buried on the DVD it submitted to the city clerk—a 2008 proclamation by former Governor Schwarzenegger on drought conditions and a 2008 notice from the state Department of Water Resources to state water project contractors. Again, however, this evidence was not fairly before the city council. CREED adduced no evidence that drought in this region is new information, or that because of drought the project would have significant deleterious effects. CREED did not meet its burden of showing the City's decision to adopt an addendum to the 1994 FEIR, rather than requiring an SEIR, lacks evidentiary support.

## IV

### Greenhouse Gas Emissions/Climate Change

CREED also contends reversal is required because new information on the nexus between greenhouse gas emissions and climate change require an SEIR. Again, however, CREED failed to exhaust administrative remedies.

CREED relies solely on information that was included in the DVD it submitted to the city council, such as a January 2008 report drafted by the California Air Pollution Control Officers Association and an executive order by former Governor Schwarzenegger. As discussed, CREED did not fairly present information on the DVD to the City, and thus it does not satisfy the exhaustion doctrine.

Moreover, CREED's letter accompanying the DVD made only general, unelaborated objections such as, "Global climate change has been raised as a significant environmental issue that has been frequently analyzed in current environmental documents," and the "project will cause direct and indirect greenhouse-gas emissions that, when considered cumulatively, are significant." To exhaust administrative remedies, the objections " ' "must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them." ' " (*Sierra Club v. City of Orange, supra,* 163 Cal.App.4th

523, 536.) If that were not the case, virtually every project approval would be subject to litigation on new or expanded issues.

CREED points out that Pardee reviewed the DVD and submitted a response to the City. CREED suggests Pardee's efforts satisfy the exhaustion doctrine on the climate change issue. We disagree, but even if that were arguably true, we would hold against CREED on the merits. An SEIR is not required absent new information, and as Pardee pointed out, information on the effect of greenhouse gas emissions on climate was known long before the City approved the 1994 FEIR.

For instance, in *Massachusetts v. EPA* (2007) 549 U.S. 497, 507 [167 L.Ed.2d 248, 127 S.Ct. 1438], the United States Supreme Court explained the issue began garnering governmental attention long before the City certified the 1994 FEIR for the precise plan. The opinion states: "In the late 1970's, the Federal Government began devoting serious attention to the possibility that carbon dioxide emissions associated with human activity could provoke climate change. In 1978, Congress enacted the National Climate Program Act, 92 Stat. 601, which required the President to establish a program to 'assist the Nation and the world to understand and respond to natural and man-induced climate processes and their implications,' [citation]. President Carter, in turn, asked the National Research Council, the working arm of the National Academy of Sciences, to investigate the subject. The Council's response was unequivocal: 'If carbon dioxide continues to increase, the study group finds no reason to doubt that climate changes will result and no reason to believe that these changes will be negligible. . . . A wait-and-see policy may mean waiting until it is too late.' " (549 U.S. at pp. 507–508.)

In *City of Los Angeles v. National Highway Traffic Safety Administration* (D.C. Cir. 1990) 286 U.S. App.D.C. 78 [912 F.2d 478, 483], overruled on another ground in *Florida Audubon Society v. Bentsen* (D.C. Cir. 1996) 320 U.S. App.D.C. 324 [94 F.3d 658, 669], the Natural Resources Defense Council (NRDC) argued "increase in fossil fuel combustion . . . will . . . lead to a global increase in temperatures, causing a rise in sea level and a decrease in snow cover that would damage the shoreline, forests, and agriculture of California; and these local consequences of such a global warming would injure the NRDC's members who now use those features of California for recreational and economic purposes." The opinion adds, "According to the NRDC, this 'catastrophic and permanent' change in the global climate would reduce yields from agriculture, increase urban smog, kill forests along climatic borders, and cause a two-foot rise in the sea level, thereby destroying 80% of United States coastal wetlands, forcing salt water into coastal drinking water supplies, and severely damaging shorelines and shoreline-related industries."

The effect of greenhouse gas emissions on climate could have been raised in 1994 when the City considered the FEIR. A challenge to an EIR must be brought within 30 days of the lead agency's notice of approval. (Pub. Resources Code, § 21167, subd. (c).) Under subdivision (c) of Public Resources Code section 21166, an agency may not require an SEIR unless "[n]ew information, which was not known and could not have been known at the time the [EIR] was certified as complete, becomes available." "[A]fter a project has been subjected to environmental review, the statutory presumption flips in favor of the developer and against further review." (*Moss v. County of Humboldt* (2008) 162 Cal.App.4th 1041, 1049–1050 [76 Cal.Rptr.3d 428].) " '[S]ection 21166 comes into play precisely because in-depth review has already occurred [and] the time for challenging the sufficiency of the original EIR has long since expired . . . .' " (*Id.* at p. 1050.) CREED adduced no competent evidence of new information of severe impact, and thus it did not meet its burden of showing the City's reliance on an addendum to the 1994 FEIR is unsupported by substantial evidence.

## DISPOSITION

The judgment is affirmed. The City and Pardee are entitled to costs on appeal.

Nares, J., and O'Rourke, J., concurred.

A petition for a rehearing was denied June 28, 2011, and appellant's petition for review by the Supreme Court was denied September 21, 2011, S194703. Werdegar, J., did not participate therein.