Filed 6/6/14  Certified for publication 7/2/14 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CITIZENS AGAINST AIRPORT POLLUTION, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF SAN JOSE et al., <br><br> Defendants and Respondents. | H038781 <br> (Santa Clara County <br> Super. Ct. No. 110CV177290) |

## I.  INTRODUCTION

This CEQA[1] case arises from the eighth addendum to the 1997 environmental impact report for respondent City of San Jose's International Airport Master Plan.  The eighth addendum concerns the environmental impacts of recent amendments made by the City of San Jose (City) to the Airport Master Plan, which include changes to the size and location of future air cargo facilities, the replacement of air cargo facilities with 44 acres of general aviation facilities, and the modification of two taxiways to provide better access for corporate jets.

---

[1] California Environmental Quality Act, Public Resources Code section 21000, et seq.  All further statutory references are to the Public Resources Code unless otherwise indicated.

Appellant Citizens Against Airport Pollution (CAAP) contends that the trial court erred in denying their petition for writ of mandamus challenging City's approval of the eighth addendum. CAAP argues that the amendments to the Airport Master Plan that are addressed in the eighth addendum constitute a new project as a matter of law, and therefore an environmental impact report (EIR) addendum is barred under CEQA. Alternatively, CAAP contends that an EIR addendum cannot be used to analyze the environmental impacts of the project changes included in the amendments, since those changes are substantial and require major revisions to the EIR with respect to noise, greenhouse gas emissions, toxic air contaminants, and the burrowing owl habitat.

For reasons that we will explain, we will affirm the judgment without reaching City's claim that CAAP failed to exhaust its administrative remedies.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *The San Jose International Airport Master Plan Update and EIR*

In 1988, City began preparation of an update to the 1980 Airport Master Plan for the San Jose International Airport in order to accommodate projected growth in passenger and air cargo traffic through a planning horizon year of 2010.  In 1995, City issued a notice of preparation of an EIR for the proposed Airport Master Plan update.

The final EIR (FEIR) for the updated Airport Master Plan was approved in 1997. A supplemental EIR (SEIR) was certified in 2003.  From 1997 through 2010, eight EIR addenda that addressed the environmental impacts of amendments to the Airport Master Plan were approved.  At issue in the present appeal is the eighth addendum.

### B.  *The Eighth Addendum*

The eighth addendum to the Airport Master Plan EIR concerns amendments that change the Airport Master Plan by shifting the planning horizon year to 2027 and modifying certain master plan projects for air cargo and general aviation facilities.  One reason for the amendments is that the level of air passenger activity that was projected to be reached by the year 2017 is now projected to be reached in 2027, due to a recent

2

decrease in the annual number of passengers. Another reason for the amendments is that the current projections show that the volume of air cargo and the demand for general aviation will be less than originally projected.

Due to these changes in demand forecasts, City proposed amending the Airport Master Plan with the following modifications: (1) changes in the size and location of future air cargo facilities; (2) replacement of previously planned future air cargo facilities with 44 acres of general aviation facilities, in order to accommodate the forecast that large corporate jets will comprise the majority of general aviation; and (3) modification of Taxiway H and Taxiway K by adding new segments to provide better access for corporate jets.

The eighth addendum states that the proposed modifications "will not have any significant environmental impacts not previously disclosed in the Airport Master Plan EIR, nor will there be a substantial increase in the severity of previously-identified significant environmental impacts. Therefore, no subsequent or supplement EIR is warranted or required." The City Council approved the eighth addendum in June 2010.

C. *The Petition for Writ of Mandamus*

In July 2010 CAAP filed a petition for writ of mandamus challenging City's approval of the eighth addendum. CAAP is an unincorporated association whose members include residents and property owners in San Jose.

In its petition, CAAP argued that City violated CEQA by approving a major amendment to the Airport Master Plan without preparing a supplemental or subsequent EIR. According to CAAP, the eighth addendum failed to adequately assess or analyze the impacts of the taxiway modifications and the construction of general aviation facilities on noise, air pollution, and the burrowing owl habitat. Additionally, CAAP argued that the eighth addendum failed to comply with newly adopted rules mandating review of project impacts on greenhouse gases and climate change.

3

In its opening brief in support of the petition, CAAP further argued that it was not required to exhaust administrative remedies since there had been no public comment period or noticed public hearing on the eighth addendum. Alternatively, CAAP contended that it had exhausted its administrative remedies by objecting to the eighth addendum in a letter to the City Council and during an informal meeting with airport staff.

CAAP also argued that the eighth addendum violated CEQA because the proposed major amendments to the Airport Master Plan constituted a new project that required preparation of a new environmental document with a public comment period and a noticed public hearing. Alternatively, CAAP asserted that the reconfiguration and expansion of general aviation facilities that were proposed in the amendments constituted substantial project changes and/or changed circumstances, which required a supplemental EIR to assess significant unstudied environmental impacts on noise, greenhouse gas emissions, toxic air contaminants, and the burrowing owl habitat.

**D.** *The Trial Court's Order*

The trial court's order denying CAAP's petition for writ of mandamus was filed on August 2, 2012. At the outset, the court rejected City's contention that CAAP had failed to exhaust its administrative remedies. Although the court recognized that exhaustion of administrative remedies is a jurisdictional prerequisite to a CEQA action, the court found that CAAP was excused because there had been no public notice that "a CEQA determination or a CEQA document would be forthcoming or was contemplated."

However, the trial court found no merit in CAAP's CEQA challenge to City's approval of the eighth addendum. Relying primarily on this court's decision in *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689 (*Santa Teresa*), the trial court found that there was substantial evidence to support City's decision that an EIR addendum, rather than a SEIR, was appropriate under CEQA because (1) the noise analysis attached to the eighth addendum showed that noise impacts

4

from the proposed airport modifications would be less than the impacts that were disclosed in the 1997 FEIR and the 2003 SEIR; (2) the effects of greenhouse gases do not constitute new information that could not have been known at the time the 1997 FEIR was certified as complete; (3) the proposed airport modifications would not increase air pollution, since the projections showed that air cargo and general aviation traffic would be less than was originally projected, with a corresponding decrease in associated ground vehicle traffic; and (4) the biological survey attached to the eighth addendum stated that any burrowing owl habitat loss caused by the construction of the taxiway improvements could be mitigated, and therefore the severity of the previously identified impact on the burrowing owls would not be increased.

CAAP filed a timely notice of appeal from the trial court's order. We treat an order denying a petition for writ of mandamus under CEQA as an appealable final judgment. (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 831-832.)

### III. DISCUSSION

The issues raised by CAAP on appeal include the following: (1) the trial court erred in denying its writ petition because the amendments to the Airport Master Plan addressed in the eighth addendum constitute a new project as a matter of law, and therefore CEQA bars the use of an addendum; and (2) alternatively, the trial court erred in denying its writ petition because the amendments to the Airport Master Plan addressed in the eighth addendum constitute substantial project changes that under CEQA require major EIR revisions with respect to noise, greenhouse gas emissions, toxic air contaminants, and the burrowing owl habitat. City contends that we need not reach the issues raised by CAAP on appeal since the CEQA challenge is precluded due to CAAP's failure to exhaust its administrative remedies.

We will begin our analysis with a brief overview of CEQA, the rules that apply to an EIR addendum, and the applicable standard of review.

5

**A. *CEQA Overview***

" 'CEQA [section 21000 et seq.] embodies our state's policy that "the long-term protection of the environment . . . shall be the guiding criterion in public decisions." ' [Citations.]  As this court has observed, 'the overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing environmental damage.  [Citation.]'  [Citation.] Consistent with this strong environmental policy, the CEQA statutes and the Guidelines[2] issued by the California Resources Agency to implement CEQA 'have established a three-tiered process to ensure that public agencies inform their decisions with environmental considerations.'  [Citation.]"  *Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 687 (*Save Our Carmel River*).)

**1. EIR**

The first tier of the CEQA process requires an agency to conduct a preliminary review to determine whether CEQA applies to a proposed project.  (Guidelines, §§ 15060, 15061; *Save Our Carmel River*, *supra,* 141 Cal.App.4th at p. 687.)  "If the initial study shows that there is 'no substantial evidence that the project or any of its aspects may cause a significant effect on the environment,' the agency prepares a negative declaration so stating.  [Citations.]  If the project does not qualify for a negative declaration, the agency must proceed to the third step in the process, full environmental review in an EIR."  (*Save Our Carmel River*, *supra*, at p. 688.)

---

[2] The regulations that guide the application of CEQA are set forth in title 14 of the California Code of Regulations, and are often referred to as the CEQA Guidelines. (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 319, fn. 4 (*Communities for a Better Environment*).)  The CEQA Guidelines are accorded " 'great weight except where they are clearly unauthorized or erroneous.'  [Citation.]"  (*Ibid.*)  References to "Guidelines" hereafter are to the state CEQA Guidelines.  (Cal. Code Regs., tit. 14, § 15000 et seq.)

Thus, under CEQA, a public agency must prepare an EIR only with regard to "projects that may have significant environmental effects.  (§§ 21100, subd. (a), 21151, subd. (a))."  (*Communities for a Better Environment, supra,* 48 Cal.4th at p. 315.)  "The EIR's function is to ensure that government officials who decide to build or approve a project do so with a full understanding of the environmental consequences and, equally important, that the public is assured those consequences have been taken into account. [Citation.]"  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 449 (*Vineyard*).)

### 2.  Subsequent or Supplemental EIR

"CEQA does not require an EIR to be prepared for every step taken in the course of a project.  Once a proper EIR has been prepared, no subsequent or supplemental EIR [SEIR] is required unless (1) '[s]ubstantial changes' are proposed in the project, requiring 'major revisions' in the EIR; (2) substantial changes arise in the circumstances of the project's undertaking, requiring major revisions in the EIR; or (3) new information appears that was not known or available at the time the EIR was certified.  (§ 21166; see also Guidelines, § 15162; [citation].)  '[S]ection 21166 comes into play precisely because in-depth review has already occurred, the time for challenging the sufficiency of the original EIR has long since expired (§ 21167, subd. (c)), and the question is whether circumstances have changed enough to justify repeating a substantial portion of the process.'  [Citation.]"  (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 54-55.)

### 3.  Addendum

In addition to a SEIR, the Guidelines provide for an addendum to an EIR.  "The lead agency or a responsible agency shall prepare an addendum to a previously certified EIR if some changes or additions are necessary but none of the conditions described in

Section 15162[3] calling for preparation of a subsequent EIR have occurred."
(Guidelines, § 15164, subd. (a).) "An addendum need not be circulated for public review
but can be included in or attached to the final EIR or adopted negative declaration." (*Id.*,
subd. (c).) "The decision-making body shall consider the addendum with the final EIR or
adopted negative declaration prior to making a decision on the project. [¶] . . . A brief
explanation of the decision not to prepare a subsequent EIR pursuant to Section 15162
should be included in an addendum to an EIR, the lead agency's required findings on the
project, or elsewhere in the record. The explanation must be supported by substantial
evidence." (*Id.*, subds. (d), (e); see *Mani Brothers Real Estate Group v. City of Los
Angeles* (2007) 153 Cal.App.4th 1385, 1398 (*Mani Brothers*).)

---

**3** California Code of Regulations, title 14, section 15162, subdivision (a) states:
"When an EIR has been certified or a negative declaration adopted for a project, no
subsequent EIR shall be prepared for that project unless the lead agency determines, on
the basis of substantial evidence in the light of the whole record, one or more of the
following: [¶] (1) Substantial changes are proposed in the project which will require
major revisions of the previous EIR or negative declaration due to the involvement of
new significant environmental effects or a substantial increase in the severity of
previously identified significant effects; [¶] (2) Substantial changes occur with respect to
the circumstances under which the project is undertaken which will require major
revisions of the previous EIR or negative declaration due to the involvement of new
significant, environmental effects or a substantial increase in the severity of previously
identified significant effects; or [¶] (3) New information of substantial importance,
which was not known and could not have been known with the exercise of reasonable
diligence at the time the previous EIR was certified as complete or the negative
declaration was adopted, shows any of the following: [¶] (A) The project will have one
or more significant effects not discussed in the previous EIR or negative declaration; [¶]
(B) Significant effects previously examined will be substantially more severe than shown
in the previous EIR; [¶] (C) Mitigation measures or alternatives previously found not to
be feasible would in fact be feasible and would substantially reduce one or more
significant effects of the project, but the project proponents decline to adopt the
mitigation measure or alternative; or [¶] (D) Mitigation measures or alternatives which
are considerably different from those analyzed in the previous EIR would substantially
reduce one or more significant effects on the environment, but the project proponents
decline to adopt the mitigation measure or alternative."

8

**B.** *Standard of Review*

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' (. . . § 21168.5.) Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]" (*Vineyard*, *supra*, 40 Cal.4th at pp. 426-427, fns. omitted.)

Thus, as this court has stated, "[t]he reviewing court upholds an agency's decision not to require an SEIR if the administrative record as a whole contains substantial evidence to support the determination that the changes in the project or its circumstances were not so substantial as to require major modifications of the EIR. [Citation.] This deferential standard is a reflection of the fact that in-depth review has already occurred. [Citation.]" (*Santa Teresa*, *supra*, 114 Cal.App.4th at p. 703.) "The burden is on the appellant to show there is no substantial evidence to support the findings of the agency. [Citation.]" (*American Canyon Community United for Responsible Growth v. City of American Canyon* (2006) 145 Cal.App.4th 1062, 1070 (*American Canyon*).)

"Our role here is precisely the same as the trial court's. ' "[I]n an administrative mandamus action where no limited trial de novo is authorized by law, the trial and appellate courts occupy in essence identical positions with regard to the administrative record, exercising the appellate function of determining whether the record is free from legal error. [Citations." [Citation.] Thus, the conclusions of the superior court, and its disposition of the issues in this case, are not conclusive on appeal. [Citation.]' [Citations.]" (*Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1076.)

**C.** *Analysis*

**1. Exhaustion of Administrative Remedies**

As a threshold matter, City contends that CAAP's CEQA challenge is barred because CAAP failed to exhaust its administrative remedies by objecting to City's

approval of the eighth addendum during the public meetings that were held before the addendum was approved.

This court stated the exhaustion requirement in *Santa Teresa*: "In order to attack a decision that is subject to CEQA, the alleged grounds for noncompliance must have been presented to the public agency, and the person attacking the decision must have raised some objection during the administrative proceedings. (§ 21177, subds. (a), (b).)[4] These restrictions do not apply to 'any alleged grounds for noncompliance with [CEQA] for which there was no public hearing or other opportunity for members of the public to raise those objections orally or in writing prior to the approval of the project, . . . .' (§ 21177, subd. (e).) This subdivision codifies the rule that unless there is a clearly defined administrative procedure for resolving complaints, the exhaustion doctrine is inapplicable. [Citation.]" (*Santa Teresa*, *supra*, 114 Cal.App.4th at pp. 701-702.)

Another appellate court has explained that "[t]he rationale for exhaustion is that the agency ' "is entitled to learn the contentions of interested parties before litigation is instituted. If [plaintiffs] have previously sought administrative relief . . . the [agency] will have had its opportunity to act and to render litigation unnecessary, if it had chosen to do so." ' [Citation.] The 'exact issue' must have been presented to the administrative agency to satisfy the exhaustion requirement. [Citation.]" (*Mani Brothers*, *supra*, 153 Cal.App.4th at p. 1394.)

---

**4** Section 21177, subdivisions (a) and (b) state: "An action or proceeding shall not be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination. [¶] . . . A person shall not maintain an action or proceeding unless that person objected to the approval of the project orally or in writing during the public comment period provided by this division or prior to the close of the public hearing on the project before the filing of the notice of determination pursuant to Sections 21108 and 21152."

In *Santa Teresa*, this court determined that since the City had not either given notice that an initial study for a new water pipeline was being prepared or circulated the addendum adopting the initial study, "there was no clearly defined administrative procedure for petitioners to resolve their concerns about the project as it was finally configured, which means that the exhaustion requirement of section 21177 does not apply. [Citation.]" (*Santa Teresa*, *supra*, 114 Cal.App.4th at p. 702.) In contrast, in *Mani Brothers* the appellate court ruled that although no public hearing or public comment period had been provided for an addendum, the exhaustion requirement applied and was satisfied because the petitioners had repeatedly objected to the addendum at several public meetings. (*Mani Brothers*, *supra*, 153 Cal.App.4th at p. 1395.)

City relies upon the California Supreme Court's decision in *Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 290, in which the court ruled that "[i]f a notice of determination is filed, the public hearing provision [§ 21177, subd. (a)] requires a party wishing to challenge the project in court to raise the party's objections to the project at a public hearing held before the notice of determination is filed." City asserts that it filed a notice of determination for the project addressed in the eighth addendum and held several public meetings regarding the project before the addendum was approved. Additionally, City contends that CAAP merely made general comments on several environmental issues in its letter to the City Council, which did not satisfy the exhaustion requirement, or, alternatively, were insufficient to constitute exhaustion as to certain issues raised by CAAP in its writ petition.

CAAP acknowledges that in its letter to the City Council it "did not comment on the Eighth Addendum's inadequacy as to greenhouse gas emissions and toxic air contaminants." However, CAAP contends that it was not required to exhaust administrative remedies under *Santa Teresa*, *supra*, 114 Cal.App.4th 689 since there was no clearly defined administrative procedure to resolve concerns about the project addressed in the eighth addendum. CAAP also asserts that the public notice of the City

11

Council hearing that was held before project approval did not give any notice of CEQA action.

We need not determine as a threshold matter whether CAAP was required to or did exhaust its administrative remedies with regard to the eighth addendum. For the reasons discussed below, we may affirm the trial court's order denying CAAP's petition for writ of mandamus on the merits without reaching the exhaustion issue.

## 2. New Project

CAAP's primary argument on appeal is that the changes proposed in the amendments to the Airport Master Plan addressed in the eighth addendum constitute a new project for which a new EIR, not an addendum, must be prepared. CAAP relies on the decision in *Center for Sierra Nevada Conservation v. County of El Dorado* (2012) 202 Cal.App.4th 1156 (*Center for Sierra Nevada*) in arguing that as a matter of law the amendments addressed in the eighth addendum constitute a new project because the proposed changes are "not within the scope of the 1997 Airport Master Plan or its program EIR."

City rejects CAAP's characterization of the amendments addressed in the eight addendum as a new project. According to City, "there is no 'new project' but merely an adjustment to the existing plan that has already received environmental review." City also disputes CAAP's characterization of the 1997 EIR for the Airport Master Plan as a program EIR. According to City, the EIR "is a project-level document and has been used as such. Had the 1997 EIR been a program-level document, the many projects that have been constructed since that time would have undergone additional CEQA review."

The decision relied upon by CAAP, *Center for Sierra Nevada*, *supra*, 202 Cal.App.4th 1156 for the proposition that the reviewing court determines as a matter of law whether proposed changes constitute a new project for which an EIR is required, is distinguishable. The decision involved a program EIR adopted by El Dorado County in 2004 that acknowledged the impact of development on oak woodlands and wildlife, and

12

provided that the effects would be mitigated by formulating an "integrated natural resources management plan" within five years. (*Id*. at pp. 1162-1163.) In 2008, the county Board of Supervisors adopted an oak woodland management plan that allowed developers to pay a fee for removing oak canopies, which was based on a negative declaration. (*Id*. at p. 1166.) The appellate court determined that the administrative record supported a fair argument that the oak woodland management plan and fee program would have "a potentially significant effect on the environment" and that the 2004 program EIR did not adequately cover the fee mitigation program. (*Id*. at p. 1184.) For those reasons, the court ruled that the oak woodland management plan was a specific project and the county was required to prepare a tiered EIR "to examine its specific mitigation measures and fee rate." (*Id*. at p. 1184.)

CAAP also relies on another distinguishable decision, *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307 (*Sierra Club*). In that case, Sonoma County certified and adopted a program EIR for mining operations that included terrace mining adjacent to a river. (*Id.* at p. 1313.) A company applied for a use permit to mine 50 acres of a 145-acre parcel along the river that had been designated for agriculture. (*Id*. at p. 1314.) The Board of Supervisors adopted a negative declaration and approved the application since all of the environmental impacts that might result from the proposed changes had already been considered in the program EIR. (*Ibid*.) The appellate court determined that the trial court had properly ordered Sonoma County to set aside its approval of the project pending preparation of an EIR on the ground that the evidence did not support a determination that the company's "proposed site-specific project was either the same as or within the scope of the project, program, or plan described in the program EIR. [Citation.]" (*Id*. at pp. 1320-1321.)

The decisions in *Sierra Club* and *Center for Sierra Nevada* are distinguishable from the present case because both cases involved a county's adoption of a negative declaration for a project where the issue was whether the project came within the scope

13

of a prior program EIR. The California Supreme Court has explained the difference between a program EIR and a project EIR: "A program EIR . . . is 'an EIR which may be prepared on a series of actions that can be characterized as one large project' and are related in specified ways. (Cal. Code Regs., tit. 14, § 15168, subd. (a).)[5] An advantage of using a program EIR is that it can '[a]llow the lead agency to consider broad policy alternatives and program wide mitigation measures at an early time when the agency has greater flexibility to deal with basic problems or cumulative impacts.' (*Id.,* § 15168, subd. (b)(4).) Accordingly, a *program* EIR is distinct from a *project* EIR, which is prepared for a specific project and must examine in detail site-specific considerations. (*Id.,* § 15161.)[6]" (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1169.) "[W]here an agency prepares a 'program EIR' for a broad policy document such as a local general plan, Guidelines section 15168, subdivision (c)(2) allows agencies to limit future environmental review for later activities that are found to be 'within the scope' of the program EIR." (*Latinos Unidos de Napa v. City of Napa* (2013) 221 Cal.App.4th 192, 196.)

This court addressed a program EIR for a transit plan in *May v. City of Milpitas* (2013) 217 Cal.App.4th 1307, 1316-1317 (*May*) and stated the section 21166 standard

---

[5] California Code of Regulations, title 14, section 15168, subdivision (a) states: "A program EIR is an EIR which may be prepared on a series of actions that can be characterized as one large project and are related either: [¶] (1) Geographically, [¶] (2) As logical parts in the chain of contemplated actions, [¶] (3) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program, or [¶] (4) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways."

[6] California Code of Regulations, title 14, section 15161 states: "The most common type of EIR examines the environmental impacts of a specific development project. This type of EIR should focus primarily on the changes in the environment that would result from the development project. The EIR shall examine all phases of the project including planning, construction, and operation."

for further environmental review where a program EIR has already been prepared. In *May,* this court determined that "[s]ection 21166, part of CEQA, provides: 'When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available.' *Where environmental review has been conducted through a program EIR, CEQA requires further review only in these limited circumstances.* [Citations.]" (*May*, *supra*, at pp. 1325-1326, italics added.)

As we will explain, we find there is substantial evidence in the administrative record showing that the amendments to the Airport Master Plan that are addressed in the eighth addendum will not result in any new significant impacts on noise, air quality, and the burrowing owl habitat that are substantially different from those described in the 1997 EIR and the 2003 SEIR. (See *Santa Teresa*, *supra*, 114 Cal.App.4th at p. 704; Guidelines, § 15162, subds. (a)(1) & (2).) Therefore, even assuming, without deciding, that the 1997 EIR for the Airport Master Plan constitutes a program EIR, as CAAP argues, we are not persuaded that the proposed changes to the Airport Master Plan that are addressed in the eighth addendum constitute a new project that requires a new EIR.

### 3. Noise Impacts

The eighth addendum analyzed whether the changes proposed in the amendments to the Airport Master Plan would result in new or greater noise impacts than had been quantified in the 1997 EIR and the 2003 SEIR. The addendum concluded: "The proposed changes to the Airport Master Plan would not result in any new significant

15

noise impacts and/or noise impacts that are substantially different from those described in the 1997 SJC Master Plan Update EIR and 2003 Master Plan Update Supplemental EIR." (Italics omitted.)

In support of this conclusion, the eighth addendum stated that the data showed that the number of average daily aircraft operations would be 20 percent less in 2027 than had been projected to occur in 2010 and 2017. Additionally, the data showed that in 2027 there would "be far fewer operations by older and noisier aircraft (e.g., Boeing 727, MD-80 series, etc.) than there will be in 2010/2017. This is a result of older aircraft gradually being phased out over time and being replaced with newer and quieter aircraft."

Using "the same methodology and thresholds as those contained in the 1997 Master Plan EIR, as updated by the 2003 Master Plan Supplemental EIR," the eighth addendum further stated that the noise levels at all of the reference point locations in the vicinity of the airport would be lower in 2027 than was projected for 2017. Also, using the community noise equivalent level (CNEL) contour, which depicts the "noise footprint" of the airport, the addendum stated that the area that would be exposed to aircraft noise of 65 decibels or greater in 2027 would be reduced by 28 percent from the area projected for 2017.

Relying on the decision in *Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344 (*Berkeley Jets*), CAAP argues that the eighth addendum failed to include any analysis of the noise impacts of single-event noise from the nighttime operation of large corporate jets, and also failed to analyze the noise impact of the support facilities for those jets. Additionally, relying on this court's decision in *Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170 (*Lighthouse*), CAAP argues that the eighth addendum improperly used an " 'overall' " or " 'net' " approach to analyzing the noise impacts of the proposed amendments to the Airport Master Plan. CAAP therefore contends that there is not substantial evidence to

16

support the eighth addendum's conclusion that the noise impacts of the proposed amendments to the Airport Master Plan would not be significant.

City responds that the 1997 EIR contains an extensive noise impact analysis, including the impact of aircraft maintenance and support facilities and both cumulative and single-event noise analysis; the 2003 SEIR included a noise impact analysis stating that single event noise levels had not been recomputed since the aircraft fleet had become quieter since completion of the 1997 EIR; and the eighth addendum used the same methodology as the 1997 EIR and the 2003 SEIR in finding that noise impacts will decrease due to fewer aircraft operations and a higher percentage of new, quieter airplanes.

We emphasize that the standard of review that applies to a CEQA attack on an agency's use of an addendum to an EIR is deferential. (See *Santa Teresa*, *supra*, 114 Cal.App.4th at p. 704.) "When an agency has already prepared an EIR, its decision not to prepare an SEIR for a later project is reviewed under the deferential substantial evidence standard. [Citation.]" (*Id.* at p. 702.) "We independently review the administrative record. [Citation.] We resolve reasonable doubts in favor of the administrative decision. [Citation.] 'We do not judge the wisdom of the agency's action in approving the Project or pass upon the correctness of the EIR's environmental conclusions. [Citations.] Our function is simply to determine whether the agency followed proper procedures and whether there is substantial evidence supporting the agency's determination that the changes in the Project (or its circumstances) were not substantial enough to require an SEIR.' [Citation.]" (*Id.* at p.704.)

In *Santa Teresa*, this court rejected a CEQA challenge to the City's use of an addendum to the FEIR for a proposed water pipeline realignment, instead of a SEIR, because "the record contain[ed] substantial evidence supporting the conclusion that the environmental impact of the Silver Creek alignment upon the groundwater in North Coyote Valley was not substantially different from or greater than the impacts considered

17

in the previous [environmental] studies." (*Santa Teresa*, *supra*, 114 Cal.App.4th at p. 705.) We reach a similar result in the present case.

"The CEQA Guidelines define 'substantial evidence' as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. . . . Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence.' (Guidelines, § 15384, subd. (a).) Additionally, '[s]ubstantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts.' (Guidelines, § 15384, subd. (b).)" (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1569.)

We find there is substantial evidence to support the eighth addendum's conclusion that the proposed changes to the Airport Master Plan would not result in any new significant noise impacts and/or noise impacts that are substantially different from those described in the 1997 EIR and the 2003 SEIR. Appendix A to the eighth addendum includes the January 11, 2010 "analysis of changes in predicted future aircraft noise exposure that would occur upon adoption of the proposed Updated Master Plan Forecast for the year 2027 (2027 forecast) at [San Jose International Airport]," which was prepared by Brown-Buntin Associates, Inc. (Brown-Buntin). Brown-Buntin states in its report that its practice includes "Aviation Noise Studies."

The Brown-Buntin noise analysis includes tables that (1) compare the forecasts for daily aircraft operations and show a decrease in daily operations from 904.10 in 2010 to 722.70 in 2027; (2) state the 2027 forecast for annual average runway use by various types of aircraft, including corporate jets; and (3) show a decrease in the CNEL from 2010 to 2027 at the reference grid locations used in the 1997 EIR and 2003 SEIR. Thus, Brown-Buntin's analysis of the forecast changes and the data constitutes expert opinion

18

based on facts that the noise impact from aircraft operations is decreasing, and therefore it may be reasonably assumed that the changes proposed in the amendments to the Airport Master Plan will not result in any new significant noise impacts and/or noise impacts that are substantially different from those described in the 1997 EIR and the 2003 SEIR. As we have noted, the Guidelines provide that substantial evidence includes "reasonable assumptions predicated upon facts, and expert opinion supported by facts." (Guidelines, § 15384, subd. (b).)

Moreover, the decisions in *Berkeley Jets* and *Lighthouse*, on which CAAP relies for a contrary conclusion, do not aid CAAP. Those decisions are distinguishable since neither one involved an addendum to an EIR. In *Berkeley Jets*, *supra*, 91 Cal.App.4th 1344 citizen groups challenged the adequacy of the EIR prepared for an expansion proposal for the Metropolitan Oakland International Airport. (*Id*. at p. 1350.) In *Lighthouse*, an advocacy association challenged the City of Santa Cruz's decision to adopt a negative declaration, instead of preparing an EIR, for revisions to the general plan for a state beach. (*Lighthouse*, *supra*, 131 Cal.App.4th at p. 1177.)

As we have discussed, a different standard applies where, as here, the agency has already prepared an EIR. "In the first instance, an agency must prepare an EIR 'whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.' [Citation.] This test establishes a low threshold for initial preparation of an EIR, which reflects a preference for resolving doubts in favor of environmental review. [Citation.] [¶] When the public agency has already prepared an EIR . . . [t]he reviewing court upholds an agency's decision not to require an SEIR if the administrative record as a whole contains substantial evidence to support the determination that the changes in the project or its circumstances were not so substantial as to require major modifications of the EIR. [Citation.]" (*Santa Teresa*, 114 Cal.App.4th at p. 703.) In short, " '[a]fter a project has been subjected to environmental review, the statutory presumption flips in favor of the developer and against further

19

review.' [Citation.]" (*Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 532 (*CREED*).)

In this case, we have determined that substantial evidence supports the eighth addendum's conclusion that the proposed changes to the Airport Master Plan would not result in any new significant noise impacts and/or noise impacts that are substantially different from those described in the 1997 EIR and the 2003 SEIR.

### 4. Greenhouse Gas Emissions

According to CAAP, the eighth addendum violates CEQA because it failed to comply with section 15064.4, subdivision (a)[7] of the Guidelines by making " 'a good-

_____

[7] California Code of Regulations, title 14, subdivision 15064.4 states: "(a) The determination of the significance of greenhouse gas emissions calls for a careful judgment by the lead agency consistent with the provisions in section 15064. A lead agency should make a good-faith effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of greenhouse gas emissions resulting from a project. A lead agency shall have discretion to determine, in the context of a particular project, whether to: [¶] (1) Use a model or methodology to quantify greenhouse gas emissions resulting from a project, and which model or methodology to use. The lead agency has discretion to select the model or methodology it considers most appropriate provided it supports its decision with substantial evidence. The lead agency should explain the limitations of the particular model or methodology selected for use; and/or [¶] (2) Rely on a qualitative analysis or performance based standards. [¶] (b) A lead agency should consider the following factors, among others, when assessing the significance of impacts from greenhouse gas emissions on the environment: [¶] (1) The extent to which the project may increase or reduce greenhouse gas emissions as compared to the existing environmental setting; [¶] (2) Whether the project emissions exceed a threshold of significance that the lead agency determines applies to the project. [¶] (3) The extent to which the project complies with regulations or requirements adopted to implement a statewide, regional, or local plan for the reduction or mitigation of greenhouse gas emissions. Such requirements must be adopted by the relevant public agency through a public review process and must reduce or mitigate the project's incremental contribution of greenhouse gas emissions. If there is substantial evidence that the possible effects of a particular project are still cumulatively considerable notwithstanding compliance with the adopted regulations or requirements, an EIR must be prepared for the project."

faith effort, based to the extent possible on scientific and factual data, to describe, calculate, or estimate the amount of greenhouse gas emissions resulting from a project.' "[8]

City maintains, relying on the decision in *CREED*, *supra*, 196 Cal.App.4th 515, that "[a]nalysis of greenhouse gas impacts was not required when the 1997 EIR or the 2003 Supplemental EIR were prepared, nor is a supplemental EIR required for that purpose now." We agree.

A requirement that the potential environmental impact of greenhouse gas emissions be analyzed was recently added to the Guidelines: "Effective March 18, 2010, the Guidelines were amended to address greenhouse gas emissions. (Guidelines, § 15064.4.) The amendment confirms that lead agencies retain the discretion to determine the significance of greenhouse gas emissions and should 'make a good-faith effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of greenhouse gas emissions resulting from a project.' (Guidelines, § 15064.4(a).)" (*Citizens for Responsible Equitable Environmental Development v. City of Chula Vista* (2011) 197 Cal.App.4th 327, 336; see also *Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 940.) Thus, the Guidelines did not require analysis of greenhouse gas emissions at the time the 1997 EIR and the 2003 SEIR for the Airport Master Plan were certified.

However, the potential environmental impact of greenhouse gas emissions has been known since the 1970's. " 'In the late 1970's, the Federal Government began devoting serious attention to the possibility that carbon dioxide emissions associated with

---

[8] The Guidelines state that the definition of " '[g]reenhouse gas' or 'greenhouse gases' includes but is not limited to: carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons and sulfur hexafluoride." (Cal. Code Regs., tit. 14, § 15364.5.)

21

human activity could provoke climate change. In 1978, Congress enacted the National Climate Program Act, 92 Stat. 601, which required the President to establish a program to "assist the Nation and the world to understand and respond to natural and man-induced climate processes and their implications," [citation]. . . .' [Citation.]" (*CREED*, *supra*, 196 Cal.App.4th at p. 531, quoting *Massachusetts v. EPA* (2007) 549 U.S. 497, 507-508.)

Moreover, as one appellate court has noted, " 'In 2002, information about the potential impacts of GHGs [greenhouse gases] was widely known. The United Nations Framework Convention on Climate Change was established in 1992. The regulation of greenhouse gas emissions to reduce climate change impacts was extensively debated and analyzed throughout the early 1990s. The studies and analyses of this issue resulted in the adoption of the Kyoto Protocol in 1997. In the early and mid 2000s, GHG's and climate change were extensively discussed and analyzed in California. In 2000, SB 1771 established the California Climate Action Registry for the recordation of greenhouse gas emissions to provide information about potential environmental impacts.' " (*Concerned Dublin Citizens v. City of Dublin* (2013) 214 Cal.App.4th 1301, 1319 (*Concerned Citizens*).)

Thus, information about the potential environmental impact of greenhouse gas emissions was known or could have been known at the time the 1997 EIR and the 2003 SEIR for the Airport Master Plan were certified. We reiterate, as stated in *CREED*, that under section 21166, subdivision (c), "an agency may not require an SEIR unless '[n]ew information, which was not known and could not have been known at the time the [EIR] was certified as complete, becomes available.' " (*CREED*, *supra*, 196 Cal.App.4th at p. 532.) Since the potential environmental impact of greenhouse gas emissions does not constitute new information within the meaning of section 21166, subdivision (c), City did not violate section 15064.4 of the Guidelines by failing to analyze greenhouse gas emissions in the eighth addendum. (See *CREED*, *supra*, at p. 532 [use of addendum upheld; SEIR was not required because information on the effect of greenhouse gas

22

emissions was known before approval of the 1994 FEIR]; see also *Concerned Citizens*, *supra*, 214 Cal.App.4th at p. 1320 [new Guidelines on greenhouse gas emissions did not require a SEIR where potential effects of greenhouse gases could have been addressed when EIR certified in 2002].)

### 5. Air Quality

Regarding air quality, the eighth addendum concludes that "[t]he proposed changes to the Airport Master Plan would not result in any new significant air quality impacts and/or air quality impacts that are substantially different from those described in the 1997 SJC Master Plan Update EIR." (Italics omitted.)

In support of this conclusion, the eighth addendum states: "[N]one of the proposed modifications to the approved Airport Master Plan will result in 1) an increase in activity levels at the Airport beyond that identified in the Plan, or 2) an increase in the capacity of the Airport beyond that identified in the Plan. Therefore, emissions of air pollutants, as pertains to the Airport, and as identified in the 1997 Airport Master Plan EIR, are not expected to change."

CAAP briefly argues, in reliance on the decision in *Berkeley Jets*, that the eighth addendum "simply states that there will be no change in air pollutants" and that the change in general aviation operations triggers the need for an updated analysis of toxic air contaminants.

City responds that the eighth addendum correctly concluded that the proposed changes to the Airport Master Plan will not result in any significant or substantially different air quality impacts, since "the 1997 EIR disclosed air pollution for higher levels of activity at the Airport than that anticipated for the horizon year 2027."

We determine that CAAP has not met its burden to show that the eighth addendum's conclusion regarding air quality is not supported by substantial evidence. (See *American Canyon*, *supra*, 145 Cal.App.4th at p. 1070.) CAAP does not dispute the evidence showing that daily aircraft operations are projected to decrease from 904.10 in

23

2010 to 722.70 in 2027.  Thus, the record contains substantial evidence supporting the eight addendum's conclusion that impact of the Airport Master Plan project changes upon air quality was not substantially different from or greater than the impacts considered in the previous EIR and SEIR.  (See *Santa Teresa*, *supra*, 114 Cal.App.4th at p. 705.)

The decision in *Berkeley Jets* does not alter our conclusion.  As we have noted, *Berkeley Jets* is not applicable here because it did not involve review of an addendum to an EIR.  (*Berkeley Jets*, *supra*, 91 Cal.App.4th at p. 1350 [challenge to adequacy of the EIR prepared for an expansion proposal for the Metropolitan Oakland International Airport; EIR inadequate due to outdated information about the emission of toxic air contaminants].)

### 6. Biological Resource Impacts (Burrowing Owls)

The eighth addendum concludes that "[t]he proposed changes to the Airport Master Plan would not result in any new significant biologic impacts and/or biologic impacts that are substantially different from those described in the 1997 SJC Master Plan Update EIR."  (Italics omitted.)

In support of this conclusion, the eighth addendum states that the 2008 biological survey showed that the four acres of airfield that will be used for the proposed taxiway extensions are limited to grassland and herbaceous plants, and that trees and wetlands are absent.  The eighth addendum also states that there is no suitable habitat on the airfield for any endangered species.  However, the eighth addendum acknowledges that construction of the taxiway extensions will cause the permanent loss of approximately four acres of burrowing owl habitat.  The burrowing owl is a "California species of concern, . . . known to nest and forage on portions of the Airport, most notably the unpaved areas of the airfield."  To offset the loss of four acres of burrowing owl habitat, the eight addendum includes a number of mitigation measures.

CAAP contends that there is no substantial evidence that the changes proposed in the amendments to the Airport Master Plan "will not be significant" and asserts that the

24

impacts on the burrowing owl habitat "must be studied and subjected to public and agency review." Further, CAAP argues that a much more detailed burrowing owl plan was found inadequate in *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645 (*San Joaquin Raptor*). In response, City argues that the eighth addendum explains that the impact on the burrowing owl habitat will be mitigated as stated in the Burrowing Owl Management Plan set forth in the 1997 EIR.

Our analysis is again governed by the deferential standard of review that we apply to an agency's decision to use an EIR addendum instead of a SEIR. "When an agency has already prepared an EIR, its decision not to prepare an SEIR for a later project is reviewed under the deferential substantial evidence standard. [Citation.]" (*Santa Teresa*, *supra*, 114 Cal.App.4th at p. 702.) " 'Our function is simply to determine whether the agency followed proper procedures and whether there is substantial evidence supporting the agency's determination that the changes in the Project (or its circumstances) were not substantial enough to require an SEIR.' [Citation.]" (*Id.* at p.704.) Moreover, it has been held that "[m]itigation measures adopted when a project is approved may be changed or deleted if the agency states a legitimate reason for making the changes and the reason is supported by substantial evidence. [Citation.]" (*Mani Brothers*, *supra*, 153 Cal.App.4th at p. 1403 [no SEIR required where substantial evidence supported reasons for changes in EIR's mitigation measures].)

We determine that, with regard to the burrowing owls, the record contains substantial evidence to support City's conclusion that the project changes proposed in the amendments to the Airport Master Plan were not substantial enough to require an SEIR, because the impact on the burrowing owl population is not substantially different from or greater than the impact considered in the 1997 EIR. (See *Santa Teresa*, *supra*, 114 Cal.App.4th at p. 705.)

The 1997 EIR for the Airport Master Plan concluded that implementation of the projects proposed in the Airport Master Plan update would impact the burrowing owl

25

population by replacing 38 acres of their grassland habitat with paving or structures or by destroying nesting habitat during construction activities. The EIR further stated: "The elimination of burrowing owl habitat and the potential mortality of burrowing owls due to construction or operational causes are both direct effects to a California species of special concern."

The 1997 EIR included measures to mitigate the impact on the burrowing owl population, which were set forth in the Burrowing Owl Management Plan. Among other detailed measures, the Burrowing Owl Management Plan provided that "[a]pproximately 84 acres of infield will be designated specifically for burrowing owl management at the ends of the runways and between taxiways Y and Z. Burrowing owls that have established nests in Runway Safety Areas or construction area will be relocated to designated management areas. Burrowing owl management areas will be mowed according to the regular mowing regime throughout the Airport infields to maintain the low, open vegetation that is an important characteristic of burrowing owl habitat." The mitigation measures also include the regular monitoring of the burrowing owl population. The 1997 EIR further states: "The above feasible mitigation measures, which are incorporated into the Project as a condition of approval, will avoid or substantially lessen the significant environmental impact described above to a less-than-significant level."

The mitigation measures included in the eighth addendum additionally provide that the Airport will offset the four acres of burrowing owls habitat that will be lost when the taxiway extensions are constructed, by designating four different acres of grassland as a permanent owl management area. Biologists have recommended that particular location due to "its proximity to the population of owls on the airfield, its suitable habitat, and its absence of human activity (except for occasional maintenance). To maintain comparable habitat conditions for burrowing owls, the vegetation on the . . . site will be mowed regularly according to the same schedule of mowing for the airfield infields."

26

The eighth addendum's mitigation measures also provide that a biologist will survey the area of the taxiway extensions before construction begins to identify the burrowing owls' burrows so that one-way doors can be installed for at least 48 hours, in order to avoid trapping owls inside a closed burrow. Additionally, the artificial burrows that will be impacted by the taxiway extensions will be installed elsewhere in the airport. The eighth addendum states: "This mitigation is part of the Burrowing Owl Management Plan and is a standard mitigation for all airfield projects."

Thus, there is substantial evidence in the record to support City's reasons for changing the mitigation measures for the impact on the burrowing owl population. (See *Mani Brothers*, *supra*, 153 Cal.App.4th at p. 1403.) Due to the construction of the taxiway extensions, City will change the location of four acres of the 84 acres originally designated as the burrowing owl management area in the 1997 EIR, prevent the owls from being trapped in the burrows, and relocate the impacted artificial burrows. The newly designated four acres will be managed under the existing Burrowing Owl Management Plan as set forth in the 1997 EIR. We may therefore reasonably assume that the mitigation measures incorporated in the eight addendum will maintain the environmental impacts on the Airport's burrowing owl population to less a than significant level. Accordingly, the relocation of four acres of burrowing owl management area does not constitute "a substantial increase in the severity of previously identified significant effects" that would warrant a subsequent EIR. (Guidelines, § 15162, subds. (a)(1) & (2).)

The decision in *San Joaquin Raptor* does not aid CAAP's contrary argument because that decision did not involve review of an EIR addendum and is otherwise distinguishable. In *San Joaquin Raptor*, the CEQA challenge concerned the adequacy of the EIR's analysis regarding the impacts on biological resources and wildlife habitat, including burrowing owl habitat. (*San Joaquin Raptor*, *supra*, 149 Cal.App.4th at p. 668.) The appellate court determined that "[a]lthough many valid mitigation measures

27

are described, no reason is given for deferral of the land management plan concerning the burrowing owl preserve, nor are any criteria or standards of performance set forth." (*Id.* at p. 671.) In contrast, in the present case there is no indication that the mitigation measures intended for the burrowing owl population under the Burrowing Owl Management Plan will be deferred.

### D. *Conclusion*

For these reasons, we find there is substantial evidence in the administrative record showing that the amendments to the Airport Master Plan that are addressed in the eighth addendum will not result in any new significant impacts on noise, air quality, and the burrowing owl habitat that are substantially different from those described in the 1997 EIR and the 2003 SEIR. (See *Santa Teresa*, *supra*, 114 Cal.App.4th at p. 704; Guidelines, § 15162, subds. (a)(1) & (2).) Consequently, we also determine that the amendments (which include changes to the size and location of future air cargo facilities, the replacement of air cargo facilities with 44 acres of general aviation facilities, and the modification of two taxiways) do not constitute a new project and do not require a SEIR under section 21166. We also determine that City did not violate section 15064.4 of the Guidelines by failing to analyze greenhouse gas emissions in the eighth addendum. We therefore conclude that the trial court did not err in denying CAAP's petition for writ of mandamus.

## IV. DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____

MÁRQUEZ, J.

_____

GROVER, J.

28

Filed 7/2/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CITIZENS AGAINST AIRPORT POLLUTION,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SAN JOSE et al.,<br><br>    Defendants and Respondents. | H038781<br>(Santa Clara County<br>Super. Ct. No. 110CV177290)<br><br>ORDER CERTIFYING OPINION<br>FOR PUBLICATION |

THE COURT:

The law partnership of Remy, Moose, Manley, LLP; the law firm of Nossaman Guthner Knox et al; the Silicon Valley Leadership Group; and respondents have requested that our opinion, filed on June 6, 2014, be certified for publication. Appellant filed opposition.

It appears that our opinion meets the standards set forth in California Rules of Court, rules 8.1105(c). The requests are GRANTED. The opinion is ordered published in the Official Reports.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.


_____
MÁRQUEZ, J.


_____
GROVER, J.

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No.: 110CV177290 |
| Trial Judge: | Hon. Joseph Huber |
| Attorney for Appellant:<br>Citizens Against Airport Pollution | Brandt-Hawley Law Group<br>Susan Brandt-Hawley |
| Attorneys for Respondents:<br>City of San Jose et al. | Office of the City Attorney<br>Margo Laskowska |
| | Office of the City Attorney<br>Nora Frimann |